Okay, the next argued case is docket number 201715, Omni MedSci, Inc. v. Apple, Inc. Mr. Cushion. Good morning, Your Honors. Three aspects of Dr. Islam's 1992 contract with the University of Michigan demonstrate that it was a present assignment of title to his future inventions. First, it states that Bylaw 310 governs the assignment of his intellectual property rights. Second, it states that patents on his inventions shall be the property of the university if they meet the conditions in Paragraph 1. And third, nothing in his contract requires Dr. Islam to take any action after an invention is made to assign title to the university. Instead, when Dr. Islam makes an invention meeting the conditions in Paragraph 1, title to that invention transfers automatically to the university by operation of law. And Dr. Islam has acknowledged this is precisely how his contract works. In 2007, he agreed the university owned one of his inventions despite his attempt to assign that same invention to another one of his companies. He also testified that he did not execute an assignment that transferred title of that invention to the university after he had made it. Instead, as he acknowledged in this agreement, the invention and the patents on it automatically became property of the university by operation of Bylaw 310. Mr. Krishan, this is Judge Lin. I understand your argument. I understand your focus on Paragraph 1 of the Bylaws 3.10. What about Paragraphs 4 and 5, and particularly Paragraph 5, which I think if read together, lays a fairly clear meaning in the phrase shall be as not a statement of present action, but a statement of command or future intention. What do you say to that? So, Paragraph 5 is not implicated by this case. I mean, both parties agree to that. The language in Paragraph 5 is also addressing a situation where there's a contribution of both the actions of the inventor and supported by the university, as well as an independent source of support. But it uses the same phrase, shall be owned or shall be the property. So, I mean, you can't read these paragraphs alone. They have to be read together, correct? Correct. You can look at the entire agreement, and what you see in those three paragraphs are declarations of status of certain issues. In Paragraph 1, it's defining the status of patents that have been supported by university funding. Paragraph 4 is defining the status of patents that are supported by no U.N. funds. And Paragraph 5 is addressing a situation where there has been a writing entered into by the parties to govern ownership and exploitation of the patent. In that instance, there's no timing requirement, there's no requirement that those agreements come actually into effect, and there's no requirement to secure such a writing. When you look at Paragraph 5, it says, if there is an agreement, that will control ownership. And that is true. If there's no agreement, and there's a single inventor, as in this case, the default rules in Paragraphs 1 and 4 dictate ownership. This is Judge Chen. Just to follow up on Judge Lynn's question, because his question is very relevant to my own issues in this appeal. Are you basically saying that the phrase shall be operates in one way for Paragraph 1, but operates in a different way for Paragraph 5? It has to, because the sentences are different. The way that shall be is used in each of these three paragraphs is addressing a different condition. So in Paragraph 1, it's indicating that if an invention is supported by U.N. funding, that invention shall be the property of the university. In Paragraph 5, the words shall be are not dictating or addressing whether the funding If there is a writing governing ownership and exploitation of the patent, that writing shall govern the issues of ownership and exploitation. These are declarations. They're not identical sentences, and that's really important to understand where the error of the district court was. It is in the use of the word shall be in conjunction with the remaining passage of each clause that dictates what the effect of the language is. I mean, this area of law is difficult, and it's not very fun. But, you know, for 30 years now, since 1991, I think we have case law on the books that define how you construct these employment agreements to make it clear whether the intention is to make it an automatic assignment or to make it an assignment that's contingent or something that will take effect at a later time. And it's very clear through our case law over and over again. If you say something in the present tense, in the active voice, I hereby assign, I hereby grant, everybody will understand under our established case law what that means. You know, I look at Arachnid in 1991, and the phrase was shall be the property of and all rights thereto will be assigned to. And we said that wasn't a present assignment. That was not an automatic assignment. That was something of an agreement to assign. And I see that part of that phrase, part of that provision was shall be the property of, which is the very phrase that we have here in Dr. Islam, or in the bylaws 3.10, paragraph 1. So could you comment on that, how there is at least some facial similarity between what we have here in this case and what we've seen in the past and concluded there was no present assignment? Thank you for your question, Judge Chen. That point raises an important contrast between the contract that was at issue in Arachnid and the contract you're looking at here. What was critical to that decision in Arachnid was that the contract envisioned explicitly that the inventor would take an action after the invention is made to assign title to the invention. So it wasn't just the words shall be in isolation. It was the contract identifying an act of the inventor after the invention is made to transfer title. Here, there's no comparable clause. It's simply a statement that says if the condition specified in paragraph 1 is true for that future invention. I get that you're right, but nevertheless, going back to Arachnid, the provision also said not only will be assigned, but also said shall be the property of. And that apparently wasn't good enough to convert that overall provision into a present assignment or a present transfer or automatic transfer by some operation of law. Well, and again, thank you again. The question really does have to focus on the operation of the contract as a whole, and that's really a critical point that you see throughout this court's jurisprudence. When you look at the contract, you have to define the intention of the parties and whether there is expected to be an action of the inventor after the invention is made to transfer title or whether it's going to operate by law when that condition is true in the future. And in here, you have extrinsic evidence, which is in the form of this 2007 agreement between Dr. Islam and the university where he's acknowledging that the title in his case transfers without him taking that affirmative act of transferring title after the invention is made, but instead it's transferring by operation of paragraph 3.1. I'll also note that there are other cases which have employed this kind of shall be language and have been found to be present assignments in the Supreme Court. Actually, two examples are addressed in the Roche case where the court observed that the shall be language in those provisions unambiguously divested inventors' title to their future inventions. And in this case, in Film Tech, in this court, there was a similar form of expression where the invention shall vest in the United States, and in that instance, it was found to be a present assignment. So you have to look at the entirety of the agreement and decipher if there is an obligation of the inventor to act in the future or if that transfer is going to occur as an operation of law when the condition is true for that future invention. And I will make one last point. The court below, the Texas court in particular, noted that the future events were the critical thing that it had focused on, you know, that there was a need to determine if there was funding or not. Every invention that is governed by these provisions is going to be something that happens in the future. So the question is really focused on is the condition true as specified in the contract that will trigger the operation of the provision causing transfer of title, or is there something else the inventor has to do in the future after the invention is made? So here, we believe the language is clear. There's no additional requirement from Dr. Islam to assign title to his inventions after he makes them. And the language is very much aligned with film tech and the other examples from the Roche case. Mr. Krishan, this is Judge Lin again. I certainly agree with you that you have to look to the agreements as a whole or look to the documents as a whole to determine what the intention was. But if you look at the circumstances and the situations that were referenced by the Supreme Court in the Roche case, where shall be was used, those documents taken as a whole make it pretty clear that the rights vest immediately. They either use that expression or otherwise indicate that rights vest immediately. And we don't have that here. Isn't that a problem for you? Well, I think I might disagree with your suggestion that the language in paragraph one isn't of the same character. I believe that language is straightforward and declarative. If the condition is true of U.M. funding, that invention is the property of the University of Michigan. But there's no other language that doesn't say and shall vest or and shall hereby assign or words to that effect. There is no additional language like that. And that is actually a signal that it's operating the way we believe it is. And this is also something which the University of Michigan believes is how their provision works. Mr. Cushion, before you go, there's also the question of this invention report form that professors like Dr. Islam have to sign. And I guess in that form, it makes it very clear it actually has the hereby assigned language, that active voice present tense language. And I'm now wondering why shouldn't we look at the invention report form along with the bylaws as some kind of two-step process where the first step is the bylaws, which say perhaps the way to understand the bylaws is this is what we intend. And I agree that I am ultimately obligated to assign these rights over. And then comes at a later date the actual invention report form, which undoubtedly unquestionably represents an actual present automatic assignment because it's now saying I hereby assign the invention to the university. So is there something there that we should be looking at these two pieces as a two-step process overall? So the form is not part of the agreement that Dr. Islam signed with the university in 1992. And it is actually not even part of the tech transfer policy that has been implemented by the university. It's something one step below that. What you see in that form is, as I said, not part of the contract. So it can't override the contractual obligations Dr. Islam has. More directly, you've actually addressed a scenario like this in your DDB tech case in footnote three on page 1290. You make an observation that there was an obligation in the contract in that case for an inventor to issue a specific assignment after inventions were made. And you found that to be inconsequential because the primary agreement that dictated the transfer of title was clear. And we believe that's the situation we have here. That form is different than the footing. And it's not on the same footing as the contract that dictates the ownership question. And that primary document, that one actually said I hereby grant and assign.  That is part of the DDB. In DDB? Yes. Yes, Your Honor. And that helped the court reach the conclusion it was a present assignment. But, again, you can reach that conclusion as well. My last point before, and I'd like to reserve some time for rebuttal, that form is extrinsic evidence. And there's a lot more probative extrinsic evidence as to the operation of this contract in the words of the two solvers. And I'll just reserve my time. Okay. No, we'll save you rebuttal time. Any more questions at the moment for Mr. Koshin? No, thank you. No? Okay. Then let's hear from, on behalf of the university, Ms. Weidlich. Thank you, Judge Newman. Good morning, Your Honors. May it please the court. Sarah Weidlich on behalf of the Regents of the University of Michigan. I'd like to touch on a couple of things that came up in your discussion with Mr. Koshin. The first is paragraph five of bylaw 3.10. I want to make sure that, you know, the university's position and understanding of that is in the record for the court. The way paragraph five operates is it's permitting the university and, you know, any university member to agree in advance to some deviation from bylaw 3.10.1 and bylaw 3.10.4. So in advance, the parties could agree that bylaw 3.10 is not going to apply as it normally would. And in the absence of any such advance agreement, bylaw 3.10 paragraph one and bylaw 3.10 paragraph four would be operative. The second point I'd like to make is that bylaw 3.10, as Mr. Koshin mentioned, does not require an additional step be taken to effectuate the transfer. And I think that that is a key line of reasoning that has followed from this court's cases on this issue since 1991. In many of the cases, the court has considered will be assigned language, shall be assigned clear language that's indicating some additional step needs to be taken to effectuate the transfer. We simply do not have that here. The district court made that finding at appendix six. It specifically said that bylaw 3.10 is silent as to how the transfer is to occur. And we think, especially in light of the language that the Supreme Court found unambiguous in the Sanford v. Roche decision, we think that's very clear evidence that bylaw 3.10 is a present automatic assignment. This is Judge Lynn. You referred to paragraph five of 3.10 as relating to the situation where the parties agree in advance, in advance of any research activity or any work. Is that what you're saying? Right. The way that it would work is if there is no agreement in writing in advance that modifies the default provisions of paragraph 3.10, paragraph one, or paragraph four, those provisions apply. So what would happen if there was an invention made and at the time the invention was completed there was a dispute as to who contributed what? How is that resolved? So that would be resolved by the tech transfer office would do an investigation, a detailed investigation similar to what they did here, and they would determine, you know, contact the stakeholders, contact the fact witnesses, do the investigation, and determine if university resources were used pursuant to paragraph one. If they were, then the university owns it. If there had been an agreement in advance that bylaw 3.10 is not going to apply as it normally does, there could be a deviation from that. The university could agree that a faculty member could use university resources and the university would not own it, but that would need to be agreed to in advance as paragraph five permits. I'm still confused because it sounds to me like either way, whether it's in advance or whether it's after the fact, there would have to be some agreement and some resolution in writing, which is exactly what paragraph five relates to. So I think paragraph five, a couple of points. I think paragraph five is quite clear that the agreement needs to happen in advance of, you know, the work or the exploitation of the invention. And the second point is that in many of the… I'm sorry, where does the language say that? Why does it have to be done, just curious, in advance of the work undertaken that leads to a patent as opposed to after the work has been conducted and then a determination is how does the ownership split work? So, again, paragraph five works such that if there is no other writing in advance of the work being done, bylaw 3.10 paragraph one and paragraph four are the governing provisions. So in the absence of something changing those, those are the governing provisions. Does paragraph five say that? I mean, I guess I'm just asking. I don't know the answer. We believe it says that, yes. So that is what is said by it shall be owned as agreed upon in writing and in advance. And if there is no such writing… And in advance of an exploitation thereof. Yes. So that seems to be saying that the writing, the agreement on ownership, co-ownership has to be done before the invention is commercialized. Exploitation, isn't that what that means? It doesn't mean in advance of the activity, research undertaken that leads to the resulting claimed invention. Am I missing something? We think it would also apply to exploitation. May I continue, Your Honor? Yes, please continue. We also think it would also apply to the exploitation, but we think that what this is intending to do is, you know, provide that there is an opportunity to change the default rules of paragraph one and paragraph four. And I would just like to touch on one thing, if I may, the point from Judge Lynn. Many of this Court's cases finding automatic assignments of future inventions, you know, have a condition subsequent that needs to be determined in the future. You saw that in the DDB text case where there needed to be a determination of whether the conduct fell into the provisions set forth in the employment contract. So the idea that we have to make a determination in the future of whether the That's very common in all of these agreements, and we don't believe that it suggests that there's only a promise to assign in the future. One final question before you go. Bylaw 3.10 has been amended in recent years to replace or amend the shall be the property of language. Is that right? Bylaw 3.10 has not, no. It still says shall be the property of this, shall be the property of that? Yes, that's correct, Your Honor. And it doesn't say anything more definitive, what I would call definitive, you know, hereby assign or assigns or transfers? No, this language dates back at least until the 1970s. It predates the Bayh-Dole Act, and the university is obviously aware of its obligations under the Bayh-Dole Act under the Stanford v. Roche decision that interpreted that. I thought I read somewhere in the brief that the university has, since the time this litigation commenced or sometime in, say, the past five years, amended something to further clarify what the university wants. There have been, you know, you mentioned it came up earlier, the discussion about some of the changes to the form. I believe that that may be what you're referring to. There have also been amendments to the tech transfer policy over the years, particularly to make changes to revenue sharing and different things like that. The tech transfer policy has been amended. And there are the confirmatory assignments with the invention disclosure form that does have some additional hereby assigned language. How about the ownership of intellectual property section of the tech transfer policy? Was that amended? I don't recall off the top of my head if and when it was amended. As it currently stands and as it has stood since at least 2009, that section does make clear that the Bylaw 3.10 effectuates the automatic transfer because it talks about the university retaining ownership of IP produced by- That's a different argument. I was talking more about the shall be the property of language that also existed in the tech transfer policy. I don't recall off the top of my head if that has been amended. My understanding is that the shall be language has almost followed verbatim from Bylaw 3.10 in the tech transfer policy. Okay, thanks. Just one quick question, Ms. Wyzik. Again, going back to Paragraph 5, let's suppose there was no writing in advance and there was work undertaken and an invention was produced and there was some dispute. And as a result of that dispute, it was determined that Paragraph 4 should be the operative paragraph, that there was no support by the university. Under those circumstances, would the inventor have to execute an assignment to the university? No. No, if Paragraph 4 is operable and it's shown that the inventor did not use any university resources, but if there's no agreement in advance and the inventor undertakes some work, then wouldn't Paragraph 1, your argument is that these are default paragraphs and Paragraph 1 would default ownership to the inventor and then there's a dispute. My hypothetical is there's a dispute later on and it's determined after the fact that, well, no, the inventor received no support and therefore ownership should be for the university. Would there have to be an assignment? In other words, your argument is that these paragraphs 1 and 4 are default paragraphs and that title vests automatically and Paragraph 5 only kicks in in advance. And my hypothetical is there is no understanding in advance, so one of these two paragraphs, 1 and 4, operate as a default. And then if that's the case, it would seem to me that there would have to be an assignment later on if there was some sort of a dispute and a different resolution other than the default. Is that correct or not? I don't believe that that is correct and I think the circumstance that we have in this record, the extrinsic evidence of the 2007 reassignment, is a good example of that. Dr. Islam believed that he had not used any university resources in 2003 and he attempted to assign the rights to that patent to his company, Chita Omni. He later acknowledged that he had used university resources and that title had vested automatically with the university. He was not required then to assign to the university. He simply acknowledged in the 2007 reassignment agreement that the university did own it automatically by virtue of Bylaw 3.10, Paragraph 1. Okay. Thank you. Okay. Thank you. Thank you, Your Honor. Okay. We'll hear from the other side. Okay. Yes. Good morning. Thank you, Your Honor. Good morning. Let me start by giving a disclaimer. I'm an avid Michigan Wolverine. I got my engineering and law degrees from U of M  but in this case I have to disagree with them and with Apple. There's no question that in order for Apple to prevail here, they have to win on both the facts and the law. We've been talking a lot about the law in the last few minutes here but the facts here make it clear that even if only Paragraphs 1 and 4 applied and they don't, Paragraph 5 is clearly relevant here, that this falls under Paragraph 4 under the facts because the only record- I'm sorry, counsel. Could you just focus on the law? That's where the debate has been so far and I'd like you to focus on that. I'm happy to do that. Thank you. So let's talk about Paragraph 5, this in advance concept that U of M was arguing. It says in advance of an exploitation thereof. And going back a little bit in Paragraph 5, it says, in cases which involve both university-supported activity and independent activity by a university staff member, patents shall be owned as agreed upon in writing in advance of an exploitation thereof of the patents by the affected staff member. This isn't talking about making an agreement before any work is done. You have to know what the invention is before you can decide who owns what and what work relates to what. You couldn't possibly do this in advance of any work. And so I disagree with U of M's analysis of Paragraph 5. This is about doing things in advance of exploitation of the patents. And so it does fit within the same structure as Paragraphs 1 and 4, that after the inventive activity is done, there are three possibilities. One is it was all done with U of M resources. Second, it was done all with non-U of M resources. Or third, it was done with a combination of U of M resources and non-U of M resources. Those are the three possibilities covered by the bylaws, and there can't be an automatic assignment under that scenario because you have to decide whose resources were used and then figure out which of these paragraphs apply. The other thing that I think is critical here is the no added step concept that U of M and Apple have promoted. The university, the bylaws are high-level concepts, right? And the university implements those concepts in the tech transfer policy. That's exactly what the tech transfer policy says, and that was contemplated from the beginning, that there would be some way to implement these bylaws steps. The tech transfer policy requires inventors or employees to disclose their inventions to the Office of Tech Transfer. And the way that is implemented by the university is with the invention report form. That invention report form is a required additional step that must be done under the university rules. And Apple argued, well, Dr. Isen wasn't required to follow that, but he was. His agreement says he will abide by the bylaws of the university and their regulations and rules. And this is one of the rules. On page 8 of the blue brief, Apple says the policy requires university inventors to report inventions immediately to the Office of Technology Transfer. Bryce Pills, the U of M 30B6 witness, was deposed. He said explicitly that if the invention falls under U of M policies, then they're required to report those to the university. That's appendix page 525. He also said the same thing at appendix page 571. So there's no doubt that if the dividing line is doing an additional step, and I don't think that's the right dividing line, by the way, but if that's the dividing line, there's clearly an additional step required under the university policies and regulations. But I think the better approach and the right approach the cases have followed is does the language of the agreement call for some future act or is it a present act? And there ought to be a clear message from this court about how to apply these kinds of contracts. We shouldn't be in these debates, and these shouldn't be in the future either. There should be, if the language is future tense language, if it says shall be, which is future tense, then that is not a present assignment. If the language is present tense language, like the University of Florida uses, is the property of, and that comes out of the Alzheimer's Institute case from the Eastern District of Pennsylvania, then that is present tense language. That's an automatic assignment. But you have property which doesn't yet exist. So how can you define it? Well, that's a good point. But that's what it's all about, isn't it? Well, it is. That's why the language is written as I read it, the way it is, because it doesn't exist. The invention doesn't exist, but the action exists, right? So even though the invention does not yet exist, What action? You can't report an invention you haven't yet made. You can't, and you can't define an invention you haven't yet made. The dissent in the Roche Supreme Court case sort of makes this point that Film Tech may not be the right, and I'm not asking this court to overturn Film Tech, but the dissent in the Roche case says Film Tech is probably not the right solution to this. They point out that before Film Tech, the way the law worked was any assignment, regardless of how it was worded, for a future rights and invention, gave only equitable title, and there had to be some further act to give legal title. Now, Film Tech changed that. I understand that. But there needs to be some bright line now that Film Tech is the law, unless we're going to overrule Film Tech. So the bright line that's clear from the cases is if the assignment language is present tense, then it's an automatic assignment. If the assignment language, like here, is future tense, then it's not an automatic assignment, and it requires some further action to assign legal title. Now you left out an alternative, and that is after the invention is made, it is an automatic assignment, and isn't that how all of these cases that have come up have been resolved? Well, yes, but it's an automatic assignment based on the language of the contracts. And the intention of the parties. And the intention of the parties. Really what we're trying to figure out in this complex of tech transfer structures of the universities, which have produced all sorts of benefits to all concerned, as to how to avoid debates such as the one before us. Right, and the university does have the power to do that, both by, if they wanted to, changing the bylaws, but they could also do it the way they have done it, by changing their forms. So I was a visiting scholar in 2014 at the University of Michigan that taught the patent law class there, and my form said what the bylaw language says, which is, you know, any inventions I make shall be the property of the university. Well, in 2016 they changed that language and said, instead it shall be the property of the university and hereby assigns. So the university has a way to do exactly what you're saying. They can use the language of present tense assignment, and they have done that in all their forms now. They were trying to adjust to the evolution of the jurisprudence, but that didn't change the basic structure of the relationship. It perhaps refined the paperwork so that future debates might not arise, but I didn't see anywhere that it was thought that they were changing the foundation of the relationship to the extent that faculty are employed inventors. They're certainly employed. I agree. Now, remember that this bylaw was created in the 1970s, and that was at a time when, as the Roche descent explains, the law was that only equitable title would transfer. No legal title would transfer without some further act. So until 1991, after this bylaw was adopted, there was no question that this only transferred equitable title, this bylaw. Because we purists thought that you couldn't assign a piece of property whose beats and bounds you had no idea of and might never exist. Exactly. And that's still true today. That's why these three paragraphs are important, because until the invention is made, you don't know which of the three buckets this falls into, paragraph one, paragraph four, or paragraph five. And without that invention, you can't have an assignment of rights because you have to decide which bucket it falls into. Okay, now let's take this case. We know exactly what the inventions are. We know who made them, when they were made, and I believe it's no longer disputed that university resources were used. Is that correct? It's absolutely disputed. In fact, there's no evidence that any resources were used. I thought that was behind us, that these inventions were made while Dr. Islam was on the payroll. Actually, he took a leave of absence. He was not paid. He received no salary. He was not paid. And the only people with any knowledge of the work he – so let me step back. He was doing research unpaid at the cardiovascular center with several doctors. Doesn't the record show that other doctors at the center who were connected with the university participated? They worked on different research. Bryce Pills says several times in his deposition that the three doctors who worked with Dr. Islam at the CBC looked at the patent applications and said they did not relate to the work they did with Dr. Islam. That's undisputed testimony that the patent applications that we're talking about here did not relate in any way to the work Dr. Islam was doing at the CBC. There's no evidence. Are you saying then that this turns on the question of fact as to whether any university resources were involved rather than a question of law as to what would happen if any university resources were involved? I am. Apple has to win both of those prongs to win. The district court held, and there's not been any showing that it's clear error, that on the facts, this was not use of university resources. That's the footnote one in the district court opinion, which is not contested, and there's been shown no clear error in that fact finding. There were no university resources used to make these inventions. And we win on that fact alone. You don't have to reach the law even. But we also win on the law in our view as well. If there are no other questions, I have nothing else to add. Okay. Any more questions for Mr. Lurie? No, thank you. All right. Okay, well, then you have your rebuttal time, Mr. Cushon. Thank you, Your Honors. I will just take up a few points. First, the district court's decision did not rest on a finding that there was no UM funding support. The comment that Mr. Lurie made is referring to a footnote. The language in the decision in Appendix 11 says it's not the court expressly says it's not reaching the other issues besides the contract interpretation. And in the footnote, it's prefaced by the statement that this decision does not rest on defining a factual determination. So that is not a correct portrayal of what the basis of the district court's decision was. Second thing I'd like to point out is that it is absolutely disputed that the omniposition is disputed that there was no funding support. What the university did in 2013 through 2018 is conduct two different investigations into the question of whether there was funding support. And it found both times that there was. And one of the things that's really important to note is that the university found a variety of types of funding support. Use of facilities was one of them. And that is, if you look in the language of Paragraph 1 of the bylaw, it's explicitly identified as a form of indirect or direct funding support. And you heard Mr. Lurie point out that Dr. Islam was using the facilities during a sabbatical, and that's what the university also found. That's at 880 and 886 in the appendix. So there's plenty of evidence supporting the university's finding that it made and communicated to Dr. Islam that there was funding support. It's also important to recognize Dr. Islam and the university are not parties to this case. The dispute between them about whether there's funding support or not, as it's between those two, has been resolved. The university made a determination there was, and Dr. Islam never invoked the appeal procedure in the tech transfer policy that he had to use to change that determination, and he never sought to transfer the title to those inventions either. Now, on the central question, which is, what's the effect of this language? Mr. Cushin, has the university sued Dr. Islam? Not to my knowledge, but it would be somewhat odd for the university to sue Dr. Islam,  Right, but the patents are currently assigned and are being asserted here. Right, but the university has found that they own the patents, and it's up to them to decide how to deal with the breach of the contract. They've concluded they don't need to intervene. Up until this point, they hadn't. But the bottom line is that if you look at the situation on the question of funding, you have a determination by the university that has not been contested by the party that's adversely affected by it, which is Dr. Islam. And that, again, is not the basis of the district court's decision. So the last point I'd like to flag is the language that was discussed about the phrase, shall be the property of, or shall best in, keep in mind that the bylaw is not the only operative element of this contract. The contract is actually the 1992 contract, which starts with the observation that assignment of property rights of Dr. Islam are governed by the various provisions of Bylaw 3.10. And that's equivalent to the I hereby assign, perhaps, but it's definitely a clear signal that the assignment is going to be implemented according to the rules of the bylaw. The language that you had mentioned, and I think Dr. or Mr. Lurie had talked about the shall be the property of, actually, that type of language, one instance of it was addressed by the court in the majority opinion of the Supreme Court in Roche. That's the NASA language, and it is very similar to the language that's in Bylaw 3.1. It refers to the invention shall be the property of NASA if the condition is true. That's what you see in Bylaw 3.1, Paragraph 1. Okay. Any more questions for Mr. Cushing? No. No, thanks. Okay. Thanks to all counsel. The case is taken under submission.